Dolores HARRIS, Plaintiff,

v.

CITY OF HARVEY, an Illinois Municipal Corporation, et al., Defendants.

No. 96 C 3737.

United States District Court, N.D. Illinois, Eastern Division.

Feb. 17, 1998.

David Carl Thomas, Chicago–Kent College of Law, Illinois Institute of Technology, Chicago, IL, Edward Ted Stein, Michael J. Zarski, Karen E. Tamburro, Law Offices of Edward T. Stein, Chicago, IL, for Dolores Harris.

Timothy Charles Lapp, Buikema, Hiskes, Dillner, O'Donnell & Marovich Ltd., South Holland, IL, John A. Hiskes, Buikema, Hiskes, Dillner, O'Donnell & Marovich Ltd., Orland Park, IL, for City of Harvey.

Timothy Charles Lapp, Buikema, Hiskes, Dillner, O'Donnell & Marovich Ltd., South Holland, IL, John A. Hiskes, Buikema, Hiskes, Dillner, O'Donnell & Marovich, Ltd., Orland Park, IL, Kevin Brian Duckworth, Anthony L. Schumann, Karen C. Wallace,Ronetta Noella Lewis, Duckworth & Schumann, P.C., Chicago, IL, for Charles H. Givines.

Timothy Charles Lapp, Buikema, Hiskes, Dillner, O'Donnell & Marovich Ltd., South Holland, IL, Ronald Kawanna, Jr., Edward A. Antonietti, Lawrence P. Gulotta, Gulotta & Kawanna, Calumet City, IL, John A. Hiskes, Buikema, Hiskes, Dillner, O'Donnell & Marovich, Ltd., Orland Park, IL, for James Harper.

## MEMORANDUM OPINION AND ORDER

LEVIN, United States Magistrate Judge.

Pending is the Defendant City of Harvey's motion for summary judgment. For the reasons set forth below, this Court grants the motion in part and denies it in part.

### FACTUAL BACKGROUND

Plaintiff Dolores Harris ("Harris") began working for the City of Harvey (the "City") in December of 1993 in a part time clerical position in the Streets Department. (Pl.12(n) Add. Facts ¶ 1; City 12(n) ¶ 1.) Plaintiff held that position, wherein she earned approximately $5.00 an hour, until March 1994. (City 12(m) ¶ 2; Pl. 12(n) ¶ 2; Pl. 12(n) Add. Facts ¶ 3; City 12(n) Resp. ¶ 3.)

Plaintiff asserts that, during the term of her clerical position, her male co-workers made rude and demeaning sexually based comments. (Pl.12(n) Add. Facts ¶ 23.) Plaintiff states that she and another co-worker complained of the males' behavior to the Superintendent of the Department of Streets and Public Improvement, Charles Givines

("Givines"). (Pl.12(n) Add. Facts ¶ 24; City 12(n) Resp. ¶ 24.) The City acknowledges that Givines received a written complaint about the males' behavior and asserts that Givines thereafter told the men not to bother the women. (City 12(m) ¶ 17.)

After the union posted a notice on the bulletin board stating that people with a Commercial Driver's License ("CDL") could apply for a position as driver, Harris applied for the position. (Pl.12(n) Add. Facts. ¶ 5; City 12(n) Resp. ¶ 5.) When Harris applied, Givines suspected that there might be "resistance" to hiring a female driver (as Harris would be the first female driver hired by the City). (Pl.12(n) Add. Facts ¶¶ 22, 25; City's 12(n) Resp. ¶¶ 22, 25.) Because of Givines' (and apparently the mayor's) concerns regarding whether Harris could do the work performed by the garbage crews, Givines assigned Harris as a street sweeper. (City 12(m) ¶ 11; Pl. 12(n) ¶ 11; Pl. 12(n) Add. Facts ¶ 6.) [1]

Although the parties agree that, starting in March of 1994, Harris worked full time on the street sweeper performing the same job duties as other drivers (Pl.12(n) Add. Facts ¶¶ 9–11; City 12(n) Resp. ¶¶ 9–11), the parties disagree regarding what was Harris' work title. The City says that Givines hired Harris as a "driver-trainee" because she did not have the proper CDL (one that covered air brakes). (City 12(m) ¶¶ 13, 15–16; Pl. 12(n) ¶¶ 15–16.) Harris, on the other hand, states that she was a "driver" (Pl.12(n) Add. Facts ¶ 9), and that, after she applied for a driver position, Givines told her that she would be paid as a driver (between $20,000 and $30,000 annually) (Pl.12(n) Add. Facts ¶¶ 7, 8).

Nevertheless, working as a street sweeper, Harris continued to be paid at the rate of $5.00 per hour. (Pl.12(n) Add. Facts ¶ 12; City 12(n) Resp. ¶ 12.) Harris complained to Givines and to the union (of which she was a member) about her unequal rate of pay, requesting to be paid as a driver. (Pl.12(n) Add. Facts ¶ 19; City 12(n) Resp. ¶ 19; City 12(m) ¶ 18; Pl. 12(n) ¶ 18.) In July 1994,

Harris received an increase in pay (Pl.12(n) Add. Facts ¶ 20; City 12(n) Resp. ¶ 20), but, even with this increase, she earned less than the male drivers. (Pl.12(n) Add. Facts ¶ 21; City's 12(n) Resp. ¶ 21.) The City states that Harris' smaller paycheck was due to a seniority system for employees in the Public Works Department administered by the union (City 12(m) ¶¶ 18, 69; Pl. 12(n) ¶ 18), and the fact that many employees had more seniority than Harris (City 12(m) ¶¶ 3–9, 70; Pl. 12(n) ¶¶ 3–9, 70).

In addition to being paid less, Harris claims she suffered abusive incidents as a driver for the City. During her first week of work as a driver, Harris alleges that a co-worker took her to a remote location and told her "this is where the white guys take the black women for sex, and I treat my black women right, unlike other white men." (Pl.12(n) Add. Facts ¶ 27; City 12(n) Resp. ¶ 27.) Plaintiff did not immediately report this incident to her supervisors because, according to her, when she had previously complained about the male co-worker's behavior, her supervisors had done nothing to stop it. (Pl.12(n) Add. Facts ¶ 28; City 12(n) Resp. ¶ 28.) Harris notified her supervisors about the alleged incident in a letter submitted to Givines in November 1994. (Pl.12(n) Add. Facts ¶ 40, Ex. 10; City 12(n) Resp. ¶ 40.)

Harris also alleges that, on April 19, 1994, a co-worker reached down her pants and touched her buttocks while helping her get on her raincoat. (Pl.12(n) Add. Facts ¶ 30; City 12(n) Resp. ¶ 30.) Plaintiff did not complain to her supervisors about this incident. (City 12(m) ¶ 26; Pl. 12(n) ¶ 26.)

Plaintiff further alleges that, sometime in November 1994, a different co-worker fondled her breasts while Harris was in a truck with him. (Pl.12(n) Add. Facts ¶ 30; City 12(n) Resp. ¶ 30.) Harris did complain to her immediate supervisor, Charles Harper ("Harper"), about this incident whereupon Harper notified Givines about the incident and forbade the accused co-worker from being on a truck with Harris (and, in fact, the accused co-worker did not work on a vehicle

---

1. The City asserts that Givines had to make a deal with the union to allow Harris to start as a street sweeper instead of on the garbage crew

(where drivers usually start). (City 12(m) ¶ 12; Pl. 12(n) ¶ 12.)

again with Harris). (City 12(m) ¶¶ 44–45; Pl. 12(n) ¶ 44–45.)

Plaintiff asserts that, on another occasion, a different co-worker pushed her down on a mattress. (Pl.12(n) Add. Facts ¶ 32.) It is unclear from the record when Harris' supervisors became aware of this allegation, although it appears that they first received notification about this allegation during an employee meeting on December 8 or 9, 1994. (Pl.12(n) Add. Facts ¶ 47; City's 12(n) Resp. ¶ 47.)

In addition to the above particular incidents,[2] Harris alleges that her co-workers cursed at her (Pl.12(n) Add. Facts ¶¶ 33–36), and talked to her about and showed her sexual related magazines and pictures which were around the garage (Pl.12(n) Add. Facts ¶¶ 37–38; City 12(m) ¶¶ 31, 36). Harris states she verbally complained to Givines and Harper about the sexual related materials and about the men's comments (Pl.12(n) Add. Facts ¶ 39), although the City states that Harper, at least, did not receive complaints about the materials (Pl.12(m) ¶ 39).

Sometime after November 21, 1994, Harris submitted a written complaint to Givines. (Pl.12(n) Add. Facts ¶ 40, Ex. 10; City 12(n) Resp. ¶ 40.) In that correspondence, Harris complained of a "hostile, degrading, appauling [sic] enviornment [sic]" and described: (1) the incident which allegedly occurred her first day driving, (2) the alleged injury she suffered by being hit by a vehicle, (3) sexual gestures she allegedly received from some co-workers, and (4) the alleged fondling by her co-worker in a truck. (*Id.*) Harris claims that, in response, Givines called Harris a "hell-raiser." (Pl.12(n) Add. Facts ¶ 40.)

On December 8 or 9, 1994, there was a meeting of all of the garage employees, including Harris, wherein Givines told the male employees about Harris' complaints. (Pl.12(n) Add. Facts ¶ 43; City 12(n) Resp. ¶ 43.) The meeting was heated and there were threats of violence directed against Harris. (Pl.12(n) Add. Facts ¶¶ 45–46; City

12(n) Resp. ¶¶ 45–46.) After hearing an accusation against him, one male co-worker said to Harris, "I'm going to kick your ass bitch" and had to be restrained. (Pl.12(n) Add. Facts ¶ 47; City 12(n) Resp. ¶ 47.) At this meeting, Givines told the men to get rid of the pornography and stop swearing (City 12(m) ¶ 49; Pl. 12(n) ¶ 49), and at least one employee testified that, after the meeting, he did not see any more pornographic material (City 12(m) ¶ 56; Pl. 12(n) ¶ 56).

Plaintiff alleges that, shortly after the meeting, the City retaliated against her. First, Harris states that Harper assigned her to defective vehicles and assigned her to "clean up the kitchen" and do other menial tasks. (Pl.12(n) Add. Facts ¶ 50.) The City denies that it assigned Harris defective vehicles and states that, if Harris received vehicles less desirable than other workers, it was because she had less seniority. (City 12(m) ¶¶ 46–47.) In addition, the City contends that Harper only asked Plaintiff to perform menial tasks when she had nothing else to do and that Harper asked other drivers to perform such work. (*Id.* ¶¶ 62–64.)

Harris additionally states that the City then demoted her to a "grueling" janitorial position at City Hall which had a different work shift. (Pl.12(n) Add. Facts ¶¶ 51–52; City 12(m) ¶¶ 57, 61.) The parties dispute why the City transferred Plaintiff. The City states that it made the decision to transfer Harris in conjunction with occurring layoffs and that Harris' transfer prevented her being laid off. (City 12(m) ¶ 58.) The City further states that it chose to transfer Harris because she did not have the proper CDL and had the lowest seniority of the drivers. (*Id.*) On the other hand, Plaintiff states that Harper and Givines told her that she was being transferred "for her safety," and that neither Harper nor Givines told Harris that she was being transferred because of cutbacks or lay-offs. (Pl.12(n) Add. Facts ¶¶ 61–62.)

---

**2.** Plaintiff also asserts that a co-employee hit her with a vehicle in April 1994. (Pl.12(n) Add. Facts ¶ 31.) Plaintiff complained to Givines regarding this incident a couple of days after the alleged incident. (City 12(m) ¶ 28; Pl. 12(n)

¶ 28.) The court does not consider this alleged incident to be pertinent to Plaintiff's sexual harassment claim, especially in light of the fact that Plaintiff has referred to this incident as an accident. (Pl.12(n), Ex. 10.)

In March 1995, Harris states that she complained to the City's mayor. (Pl.12(n) Add. Facts ¶¶ 29, 53.) In May or June 1995, the City transferred Harris back to the Streets Department as a street maintenance worker. (Pl.12(n) Add. Facts ¶ 55; City 12(n) Resp. ¶ 55.) Although Harris sought her driver job back, she did not get it. (Pl.12(n) Add. Facts ¶¶ 57–58.)

On September 6, 1995, the City placed Harris on administrative leave without pay. (Pl.12(n) Add. Facts ¶ 59; City 12(n) Resp. ¶ 59.) Harris never returned to work. The City terminated Plaintiff's employment on December 14, 1995. (Pl.12(n) Add. Facts ¶ 60; City 12(n) Resp. ¶ 60.)

Plaintiff filed this suit against the City for sexual discrimination pursuant to 42 U.S.C. § 2000e–2(a)(1) and for violation of the Equal Pay Act, 29 U.S.C. § 206(d)(1).[3]

## ANALYSIS

### I. SUMMARY JUDGMENT STANDARDS.

Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). *See also Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Once the moving party has produced evidence to show that it is entitled to summary judgment, the party seeking to avoid such judgment must affirmatively demonstrate that a genuine issue of material fact remains for trial. *LINC Fin. Corp. v. Onwuteaka,* 129 F.3d 917, 920 (7th Cir.1997).

In deciding a motion for summary judgment, a court must construe the evidence in the light most favorable to the nonmoving party. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Nevertheless, the nonmovant may not rest upon mere allegations but "must set forth specific facts showing that

there is a genuine issue for trial." Fed. R.Civ.P. 56(e). *See also LINC,* 129 F.3d at 920. A genuine issue of material fact is not shown by the mere existence of "some alleged factual dispute between the parties," *Anderson,* 477 U.S. at 247, or by "some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Rather, a genuine issue of material fact exists only if "a fair-minded jury could return a verdict for the [nonmoving party] on the evidence presented." *Anderson,* 477 U.S. at 252.

### II. SEXUAL HARASSMENT.

Title VII prohibits "discriminat[ion] ... against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's ... sex[.]" 42 U.S.C. § 2000e–2(a)(1). There are two types of sexual harassment: (1) *quid pro quo* and (2) hostile work environment. Plaintiff argues that both types of sexual harassment have occurred here.

### A. QUID PRO QUO HARASSMENT.

■ *Quid pro quo* harassment occurs in situations "where submission to a supervisor's sexual demands is made a condition of tangible employment benefits." *Perry v. Harris Chernin, Inc.,* 126 F.3d 1010, 1013 (7th Cir.1997). *See also Bryson v. Chicago State University,* 96 F.3d 912, 915 (7th Cir. 1996). The E.E.O.C.'s Guidelines on Sexual Harassment describe *quid pro quo* harassment as follows:

> Unwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature constitute sexual harassment when 1) submission to such conduct is made either explicitly or implicitly a term or condition of an individual's employment ... [or] 2) submission to or rejection of such conduct by an individual is used as the basis for employment decisions affecting such individual.

Plaintiff's Equal Pay Act claim against Plaintiff's supervisors in their individual capacity in an earlier opinion dated January 30, 1998.

---

**3.** Plaintiff has abandoned her § 1981 race discrimination claim against the City. In addition, this court granted summary judgment as to

29 C.F.R. § 1604.11(a). *See also Bryson,* 96 F.3d at 915. Where a plaintiff demonstrates that *quid pro quo* harassment has occurred, liability is strict. *See Perry,* 126 F.3d at 1013.

Here, Plaintiff conclusorily asserts that there is *quid pro quo* harassment because Givines made it clear to Plaintiff "that putting up with the behavior of the male employees was a condition of her employment." (Pl. Resp. at 9.)

Under the facts presented to this court, Plaintiff cannot demonstrate a *quid pro quo* action. As described above, *quid pro quo* sexual harassment occurs where submission to a supervisor's sexual demands is made a condition of tangible employment benefits. Plaintiff has not presented any evidence that her supervisors conditioned her employment on submitting to sexual demands. Even assuming that Plaintiff could satisfy a *quid pro quo* claim by demonstrating that her supervisors conditioned her employment on submitting to a hostile work environment (which would seem to obscure distinction between the two types of harassment), Plaintiff does not have anywhere near the facts to support such a claim. In particular, Plaintiff's supervisors did not make any threat to Plaintiff that she would lose some employment benefit if she did not submit to a hostile work environment.[4] Therefore, summary judgment with respect to this claim is granted.

### B. *HOSTILE WORK ENVIRONMENT HARASSMENT.*

Hostile work environment harassment occurs where the harassment was "sufficiently severe or pervasive to alter the conditions of [the victim's] employment and create an abusive working environment." *Harris v. Forklift Sys.,* 510 U.S. 17, 21, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993). Here, based on the Defendant's contentions, the relevant issue(s) herein is whether Defendant knew or should have known of the harassment and, if so, whether Defendant was negligent in "remedying the harassment." *Perry,* 126 F.3d at 1013.

For an employer to be liable under a hostile work environment claim, the plaintiff essentially must first show that the employer knew or should have known of the existence of harassment. *Zimmerman v. Cook County Sheriff's Dept.,* 96 F.3d 1017, 1019 (7th Cir. 1996). Here, Harris has presented evidence that she notified the City regarding alleged harassment as follows: (1) during the term of her clerical position, prior to March 1994, Harris notified a City supervisor about men bothering her (Pl.12(n) Add. Facts ¶ 24; City 12(n) Resp. ¶ 24; City 12(m) ¶ 17); (2) at some undisclosed time, Harris verbally complained to two supervisors about the men's sexual comments and the sexual related materials in the garage area (Pl.12(n) Add. Facts ¶ 39); (3) sometime in November 1994, Harris notified her supervisor about the alleged incident in which a co-employee allegedly fondled Harris in a truck (Pl.12(n) Add. Facts ¶ 44–45; Pl. 12(n) ¶ 44–45); (4) on or after November 21, 1994, Harris submitted her written complaint to a supervisor describing certain alleged incidents and complaining about a degrading work atmosphere (Pl.12(n) Add. Facts ¶ 40, Ex. 10; City 12(n) Resp. ¶ 40); and (5) at a meeting on December 8 or 9, 1994, the employees discussed Harris' complaints (Pl.12(n) Add. Facts ¶ 43; City 12(n) ¶ 43).

In addition, Harris argues that the harassment was so pervasive and egregious that the City should have known of the harassment even absent her complaints, pointing out the facts that: (1) one of Plaintiff's supervisors said that he thought there might be "resistance" to hiring a female driver (Pl.12(n) Add. Facts ¶ 25; City 12(n) Resp. ¶ 25); (2) there were sexual related pictures around the garage (Pl.12(n) Add. Facts ¶¶ 37–38; City 12(m) ¶¶ 31, 36); and (3) the men used vulgar and derogatory words around the garage (Pl.12(n) Add. Facts ¶¶ 33–36).

Viewing Plaintiffs' evidence in its totality, the court finds that Plaintiff has demonstrated sufficient facts, for purposes of summary judgment, that the employer City knew or

---

**4.** The only arguable evidence of a threat presented by Plaintiff—that Givines told her she was hurting her chances of being a driver by complaining of harassment (Pl.12(n) Add. Facts ¶ 40)—finds no support in the record.

should have known of the existence of harassment.

■ The remaining issue, therefore, is the adequacy of the City response. What constitutes reasonable remedial action depends in part upon the gravity of the harassment, *Baskerville v. Culligan Int'l Co.*, 50 F.3d 428, 432 (7th Cir.1995), and, in part, on the sufficiency of the information made available to the employer. *Perry*, 126 F.3d at 1014–15. The EEOC Guidelines state that an employer can avoid liability only by showing that it took "immediate and appropriate corrective action." 29 C.F.R. § 1604.11(d). *See also Baskerville*, 50 F.3d at 432 (An "employer's legal duty is ... discharged if it takes reasonable steps to discover and rectify acts of sexual harassment of its employees.").

■ The City asserts that it acted reasonably with respect to the incidents that Plaintiff reported to her supervisors. The City notes that when Plaintiff and a co-worker initially complained their supervisor in February of 1994 while Plaintiff was working as a clerical worker, the supervisor ordered the men to stay out of the office area unless they had business requiring them to be there. (Pl.12(n) ¶ 17.) Then, when Plaintiff complained about pictures and magazines around the garage and vulgar language, Plaintiff's supervisors addressed the issue by telling the male workers to halt the behavior. (Pl.12(n) ¶¶ 49, 52, 56.) The City additionally notes that when Plaintiff complained about being fondled in a truck by a co-worker, Plaintiff's supervisor ordered the co-worker not to ride with Plaintiff again. (Pl.12(n) ¶¶ 44, 45.)

In response, Plaintiff claims that the men's conduct was "not clearly discouraged by appropriate measures." (Pl. Resp. at 9.) Contrary to the City's allegations, Plaintiff states, for example, that her supervisors laughed when confronted with her original verbal complaint about being bothered by men during her clerical work prior to March 1994. (Pl.12(n) Add. Facts ¶ 28.)

Whether the employer's remedial action is reasonable depends on the particular circumstances of the case, *Brooms v. Regal Tube*, 881 F.2d 412, 421 (7th Cir.1989), and is a question of fact, *Guess v. Bethlehem Steel*, 913 F.2d 463, 465 (7th Cir.1990). As such, "[g]ranting summary judgment on the issue of employer liability is a tall order." *Savino v. C.P. Hall Co.*, 988 F.Supp. 1171 (N.D.Ill. 1997).

Here, based on the evidence presented, the court finds that there is a genuine issue of material fact which remains for trial as to whether the City's response to Plaintiff's complaints was reasonable and adequate. Accordingly, summary judgment must be denied with respect to Harris' hostile work environment claim.

### C. RETALIATION CLAIM.

■ Title VII prohibits an employer from retaliating against an employee "because [the employee] has opposed any practice made an unlawful practice by [Title VII]." 42 U.S.C. § 2000e–3(a).[5] To establish a *prima facie* case of retaliation under Title VII, a plaintiff must show that: (1) he or she engaged in statutorily protected expression; (2) he or she suffered an adverse action by the employer; and (3) there is a causal link between the protected expression and the adverse action. *See, e.g., McClendon v. Indiana Sugars, Inc.*, 108 F.3d 789, 796 (7th Cir.1997). Regarding the *prima facie* case, Defendant solely argues that Plaintiff cannot satisfy the "causal link" requirement. (*See* Def. Mem. at 14.)

To demonstrate a causal link, Plaintiff must show that the adverse action taken against her was caused by her protected activity. The Seventh Circuit has said that there is a causal link where the defendant would not have taken the adverse action "but for" the protected expression. *See Gleason v. Mesirow Fin., Inc.*, 118 F.3d 1134, 1146 (7th Cir.1997). The Seventh Circuit has also stated that a plaintiff can demonstrate a

---

5. An actual violation of Title VII is not a prerequisite for a retaliation claim. Instead, the employee need only have a "sincere and reasonable belief that she is challenging conduct" that violates the law. *Hunt–Golliday v. Metropolitan Water Reclamation Dist.*, 104 F.3d 1004, 1014 (7th Cir.1997). *See also Holland v. Jefferson Nat'l Life Ins. Co.*, 883 F.2d 1307, 1314 (7th Cir.1989).

causal link by "establish[ing] that the protected activity and the adverse action were not wholly unrelated" where there was a "pattern of criticism and animosity by her supervisors following her protected activities." *See Hunt–Golliday v. Metropolitan Water Reclamation Dist.*, 104 F.3d 1004, 1014 (7th Cir.1997). It is possible to infer a causal link between the protected activity and the adverse action where the action follows "on the heels" of the protected activity and where it is reasonable to infer that the person responsible for the adverse action had knowledge of the protected activity. *See, e.g., McClendon,* 108 F.3d at 797 (two to three days between the filing of complaint and the adverse action ); *Boni v. Cook County,* No. 95 C 3860, 1996 WL 507284, at *5 (N.D.Ill. Sept.3, 1996) (a little over one month between plaintiff's complaint and the adverse action).

Here, Plaintiff alleges that her written complaints led to adverse action by the City. Plaintiff complained in writing to her supervisor on or after November 21, 1994, describing certain alleged incidents and an alleged hostile working environment.[6] (Pl.12(n) Add. Facts ¶ 40, Ex. 10–11; City 12(n) Resp. ¶ 40.) Plaintiff alleges that the City retaliated against her in December 1994 by assigning Plaintiff to menial duties instead of driving. (Pl.12(n) Add. Facts ¶ 50, Ex. 11 ¶ 6.) Then, the City transferred Harris to City Hall to work in a janitorial position. (Pl.12(n) Add. Facts ¶ 51; City 12(n) Resp. ¶ 51.)

Plaintiff states that she additionally complained in writing to the mayor in March 1995 about unfair treatment and discriminatory pay. (Pl.12(n) Add. Facts ¶ 29, Ex. 9.)

Plaintiff asserts that, in May or June of 1995, the City transferred her back to the Streets Department in a position performing physical labor. (Pl.12(n) Add. Facts ¶ 55.)

After reviewing the facts as a whole and viewing these facts in a light most favorable to Plaintiff, this court cannot say as a matter of law that Plaintiff has failed to satisfy the "causal link" requirement and, therefore, has not made a *prima facie* case for retaliation.[7] Here, there is sufficient evidence for a jury to infer a causal link between Plaintiff's written complaint to Givines around November 21, 1994 and the City's adverse action (her assignment of menial work and transfer to custodial duties at City Hall) because the action followed "on the heels of" (about one month after) Plaintiff's complaint. *See, e.g., Boni,* 1996 WL 507284, at *5.[8]

Because Harris' *prima facie* retaliation case satisfies summary judgment standards, the burden shifts to the City to present a legitimate, nondiscriminatory reason for her assignment of menial duties and transfer. *See Hunt–Golliday,* 104 F.3d at 1014. To satisfy this burden, the City first states that Harper only asked Harris to perform menial tasks when Harris had nothing else to do and that Harper asked other drivers to perform such work. (City 12(m) ¶¶ 62–64.) In addition, the City asserts that the decision to transfer Plaintiff to City Hall as a custodian was made in the face of impending lay offs by the City and may have actually prevented Plaintiff from being terminated. (City 12(m) ¶¶ 58, 59.) The City further states that Plaintiff was not qualified for a driver position because she failed to obtain the necessary

---

**6.** This was followed by a "heated" supervisor/garage employee meeting on December 8 or 9, 1994 wherein there were threats of violence directed at Harris. (Pl.12(n) Add. Facts ¶¶ 45–46; City 12(n) Resp. ¶¶ 45–46.)

**7.** In its reply brief, the City insinuates that Plaintiff's transfer to City Hall was not an adverse action by the City because it did not result in a pay decrease or change Plaintiff's working hours. Because the City first raised this point as an argument in its reply brief, it will not be considered herein and the court will assume that the transfer constituted an adverse action by the City. Anyway, Plaintiff has presented evidence that her transfer resulted in her performing janitorial duties that Plaintiff considered "grueling"

work (Pl.12(n) Add. Facts ¶ 51; City 12(m) ¶ 61) which, at least, appears to raise a factual issue regarding whether the City's action in transferring Plaintiff was an adverse employment action.

**8.** On the other hand, the court does not find that Harris' transfer back to the Streets Department following her alleged complaint to the mayor satisfies the causal link requirement because Harris not demonstrated any connection between the events, and the temporal sequence (about three months), in itself, does not militate a finding of a causal connection. Nor does the court find a causal link between Harris' complaints and her suspension in September of 1995 and termination in December of 1995 because of the extensive time lapse between the events.

CDL license classification. (City's 12(m) ¶¶ 11, 15, 58, 75.)

Because the City has articulated legitimate reasons for Harris' assignment to menial tasks and transfer to City Hall, the burden shifts back to Plaintiff to show that the City's proffered reasons are merely pretextual. *See McClendon,* 108 F.3d at 797. "Pretext means a lie, specifically a phony reason for some action." *Plair v. E.J. Brach & Sons, Inc.,* 105 F.3d 343, 348 (7th Cir.1997). To establish "pretext," a plaintiff must "produc[e] evidence that the proffered reason is false, either because it has no basis in fact or because it did not actually motivate her discharge." *Fuka v. Thomson Consumer Electronics,* 82 F.3d 1397, 1404 (7th Cir.1996).

Harris suggests that the City's proffered reasons are phony. With respect to her assignment of menial tasks, Harris states that drivers were only assigned menial tasks if they were on "light duty," but that Harris was not told she was on "light duty" at the time Harper assigned her menial work. (Pl.12(n) Add. Facts ¶ 50.) With respect to her transfer, Harris states that her supervisors did not mention layoffs at the time she was being transferred, expressing instead that she was being transferred "for her own safety." (Pl. Resp. at 11; Pl. 12(n) Add. Facts ¶ 61.)

Initially, with respect to the assignment of menial tasks, Harris' affidavit statement that drivers were only assigned these tasks if they were on light duty is conclusory. In any event, Plaintiff's statement that her supervisor did not tell her that she was on "light duty" does not demonstrate that the City's evidentiary position that supervisors occasionally asked employees to perform menial work was phony. Plaintiff has not presented any evidence that an announcement of being on "light duty" was a prerequisite to performing additional work around the garage. Indeed, the City has presented deposition testimony by six male workers stating that they, in some capacity, performed the same "menial work" performed by Harris. (City 12(m) ¶ 64; Pl. 12(n) ¶ 64.)

However, Harris' affidavit statement that her supervisors informed her that she was being transferred "for her own safety" is a different matter. A reasonable inference from this evidence is that Plaintiff was transferred due to fear for her physical safety, following the heated garage department meeting where her complaints against male co-workers were aired and addressed and Plaintiff was threatened with physical violence. This evidentiary inference contradicts Defendant's articulated reasons for the transfer (impending layoffs, etc.). Also, Plaintiff's affidavit testimony was that, when she returned to the Streets Department a number of months after her transfer, no one in the department had been laid off or transferred. (Pl.12(n), Ex. 11 ¶ 12.) This tends to contradict Defendant's stated transfer reason(s). The recited affidavit statements of Plaintiff thus present sufficient evidence of pretext to defeat summary judgment on this issue.

In view of the foregoing, summary judgment must be denied on Harris' retaliation claim.

### III. *EQUAL PAY ACT CLAIM.*

■ The Equal Pay Act prohibits employers from paying similarly situated employees differently on the basis of their gender. To establish a *prima facie* case of wage discrimination under the EPA, a plaintiff must show that: (1) different wages are paid to employees of the opposite sex; (2) the employees do equal work which requires equal skill, effort, and responsibility; and (3) the employees have similar working conditions. *Soto v. Adams Elevator Equip. Co.,* 941 F.2d 543, 548 (7th Cir.1991).

■ Here, Plaintiff has, at least for summary judgment purposes, established a *prima facie* case on her wage discrimination claim. There is no dispute that Plaintiff received different wages than the male drivers. First, when Plaintiff began working in the department in March 1994 through July 1994, she earned $5.00 per hour or $10,400 annually compared to the male employee drivers who received an annual salary of between $20,000 and $30,000. (City 12(n) Resp. ¶¶ 8, 12.) Then, when Plaintiff received her raise in July 1994, her salary remained lower than the male drivers' salaries. (*Id.* at ¶ 22.) Furthermore, the City has admitted that Harris "performed the

same job duties as other drivers." (*Id.* at ¶ 11.)

Because Plaintiff has established a *prima facie* case for summary judgment purposes, the burden shifts to Defendant to provide evidence of any of the statutorily based affirmative defenses by showing that the pay disparity results from: "(i) a seniority system, (ii) a merit system, (iii) a system which measures earnings by quantity or quality of production, or (iv) a differential based on any other factor other than sex." 29 U.S.C. § 206(d)(1). *See also Soto,* 941 F.2d at 548. Here, the City attempts to justify the pay disparities on the basis of a seniority system.[9]

The City states that it employed Harris as a driver pursuant to a collective bargaining agreement between the City and Harris' union which provided for percentage increases to be paid to employees on the basis of an employee's seniority. (City Mem. at 17, Ex. K, Article XIV, Section B.) The City does nothing other than point the court to the general seniority provision contained in the union contract, asserting that the union agreement "speaks for itself" and, therefore, it need not "compare Plaintiff to every other worker in the Public Works in order to prevail on its argument that the seniority provision in the [union agreement] exempts Plaintiff's claim under the Equal Pay Act." (Def. Reply at 12.)

This court cannot grant summary judgment for the City on this issue. Although the City has demonstrated that there was a seniority system in place, the City has not specifically demonstrated in any way how, under this seniority system, Plaintiff's situation compared or differed from the situation of other male drivers and therefore warranted a wage differential. The seniority system is "an affirmative defense on which the *employer* bears the burden of proof (persuasion)." *Fallon v. State of Illinois,* 882 F.2d 1206, 1211 (7th Cir.1989) (emphasis added). *See also Kenworthy v. Conoco, Inc.,* 979 F.2d 1462, 1467 (10th Cir.1992) ("The employer's burden of proof on exceptions to the Equal Pay Act is a heavy one."). In the circumstances here, the City's burden in this regard simply cannot be said to have been satisfied, as a matter of law, by merely attaching a general contractual seniority provision to its brief.

Nor has the City explained how the "seniority system" mandated that Plaintiff be paid at a part-time hourly rate of $5.00 per hour for the first four months of her employment instead of the full-time driver rate.[10]

Because the City has not met its burden of persuasion here, summary judgment must be denied with respect to the Equal Pay Act claim. *See, e.g., Equal Employment Opportunity Comm'n v. State of Delaware Dept. of Health and Soc. Servs.,* 865 F.2d 1408, 1414 (3d Cir.1989) (summary judgment in favor of

---

**9.** As an argument to support denial of Defendant's summary judgment motion on this issue, Plaintiff contends that the City should not be allowed to raise the existence of the seniority system because the City did not raise this issue as an affirmative defense to the EPA claim. Plaintiff alleges in conclusory fashion that the City's failure to allege this affirmative defense until its motion for summary judgment deprived Plaintiff of a fair opportunity to conduct meaningful discovery on this issue and thereby prejudiced Plaintiff. The City asserts, however, that, regardless of whether it formally requested amending its answer, Plaintiff became aware of the fact that the contract contained a seniority provision as early as Plaintiff's deposition on March 11, 1997 wherein Defendant asked questions regarding the seniority system. (City 12(m) ¶¶ 66, 68.)

An affirmative defense that is not specifically plead pursuant to Fed.R.Civ.P. 8(c) may be waived. *See, e.g., Venters v. City of Delphi,* 123 F.3d 956, 968 (7th Cir.1997). Under Fed.

R.Civ.P. 15(a), however, a district court has discretion to allow an answer to be amended to assert an affirmative defense not raised at the outset. *See Venters,* 123 F.3d at 967. Although courts do not permit defendants to "lie behind a log and ambush a plaintiff with an unexpected defense," *id.* at 968, there will be no actual prejudice to Plaintiff here. In view of the court's ruling, *infra,* Plaintiff will be allowed to take any reasonable necessary discovery she needs on this issue prior to trial. The court thus will allow the City to assert its seniority defense and grants the City leave to timely so amend its pleading accordingly. *See, e.g., Blaney v. United States,* 34 F.3d 509, 512–13 & n. 3 (7th Cir.1994); *Siwik v. Marshall Field & Co.,* 945 F.Supp. 1158, 1166–67 (N.D.Ill.1996).

**10.** Although the City asserts elsewhere, in the factual statement of its brief, that it paid Plaintiff as a part-time "driver-trainee," the City has not asserted that this job title constitutes a defense to the subject Equal Pay Act claim of Plaintiff.

employer asserting defense under Equal Pay Act is proper "only if the record shows that they established the defense so clearly that no rational jury could have found to the contrary").

### CONCLUSION

For the foregoing reasons, Defendant City of Harvey's motion for summary judgment is granted in part and denied in part as follows: (1) the summary judgment motion is denied with respect to the hostile work environment sexual harassment claim, the retaliation claim and the Equal Pay Act claim; and (2) the summary judgment motion is granted with respect to the *quid pro quo* sexual harassment claim. Plaintiff's *quid pro quo* sexual harassment claim is, therefore, dismissed with prejudice.