Felicia PERRY, Plaintiff–Appellant,

v.

HARRIS CHERNIN, INC.,
Defendant–Appellee.

No. 96–2259.

United States Court of Appeals,
Seventh Circuit.

Argued Jan. 21, 1997.

Decided Oct. 6, 1997.

Ernest T. Rossiello, Margaret A. Zuleger, Elena M. Dimopoulos (argued), Rossiello & Associates, Chicago, IL, for Plaintiff–Appellant.

Shayle P. Fox (argued), Douglas M. Werman, Marlee A. Snowdon, Fox & Grove, Chicago, IL, for Defendant–Appellee.

Before COFFEY, MANION, and DIANE P. WOOD, Circuit Judges.

MANION, Circuit Judge.

Felicia Perry worked as a cashier for Harris Chernin, Inc., which owns and operates a chain of 13 "Chernin's" shoe stores throughout the Chicagoland area. For roughly 14 months she worked at Chernin's Roosevelt Road store where she claims she was sexually harassed by the store's manager, John Jackson. She received a trial on her claims of sexual harassment and constructive discharge, but at the close of all the evidence at trial the district court entered judgment as a matter of law for Chernin's. Because Chernin's had no reason to know about the alleged harassment until Perry quit and then complained, we affirm the district court.

**I.**

Perry was hired in January 1993 to work as a display person at Chernin's Roosevelt Road store on the near southwest side of Chicago. On her first day, she was reassigned to work as a cashier, a position she held until her last day at Chernin's in April 1994. During this period, her immediate supervisor was George Karnia, who managed the handbag counter at the shoe store. Karnia reported to John Jackson, the store manager, who in turn reported to Mickey Reynolds, the general manager of retail operations.

■ At trial, Perry claimed that during her 14–month tenure at Chernin's, Jackson made sexually harassing remarks to her. Though Jackson denies making any harassing comments to Perry, for purposes of reviewing the directed verdict Perry's version of events is the one we accept. *Deimer v. Cincinnati Sub–Zero Products, Inc.*, 58 F.3d 341, 343 (7th Cir.1995). The first incident occurred more than six months into her employment (in July or August 1993) when Jackson commented to Perry, "You know you

want me, don't you?" Approximately two months later, Jackson called Perry into his office ostensibly to discuss her performance. After commenting on her absenteeism, Jackson said, "By the way, [in] your interview, I saw your breasts. I saw your nipples.... You wore a low-cut blouse, and I could see your breasts, and I knew your nipples were hard." In the fall of 1993 Jackson told Perry he would "beat [her] with the stick [her] husband used," from which she inferred that he wanted to have sex with her. Around the same time Jackson commented to Perry that she never smiled, and further remarked, "If you had woke up with me in your bed this morning, you would be smiling right now." He made a similar remark in January 1994. On other occasions, he asked her if she was a "screamer" in bed and commented that she wore her clothes well.

It is undisputed that Perry never reported any of Jackson's comments to anyone at Chernin's, including Chernin's management. It also is undisputed that Chernin's had published policies against sexual harassment in the workplace. One policy appeared in the employee handbook Chernin's issued to Perry when she started work. Perry was familiar with the policy, which directed an employee "to report any form or suspicion of harassment immediately to [her] manager or directly to the Director of Human Resources or the Executive Vice President." In addition to the handbook, Chernin's distributed a pamphlet elaborating on the harassment policy and instructing employees to "promptly report unwelcome harassment" to one (or more) of four corporate officers, including Dan Naslund, the Director of Human Resources. Further still, the company addressed sexual harassment in at least three employee meetings, one of which was specially convened in early 1993 to discuss the issue. Perry received a sexual harassment "primer" during the special meeting, but she never read it.[1] At trial, she recalled that the employees were told at the meeting to report any sexual harassment to Dan Naslund, who was in attendance, and who visited Perry's store about twice per week while Perry worked there. During those visits, Naslund never witnessed any harassment of Perry,

nor was he ever approached by her concerning Jackson's behavior.

Perry finally did complain about Jackson's behavior, but not until after she quit her job. She quit on April 24, 1994, following an incident in which Jackson reprimanded her for chewing gum and receiving a personal phone call at work (both are violations of work rules, though Perry claims the rules are not consistently enforced). It was Perry's first day back at work in two to three weeks after recovering from injuries sustained by her husband's physical abuse. As a result of Jackson's reprimand, incidents occurring in Perry's last year of employment "crashed down on [her]." She gathered her purse, left the store, and never returned.

Two or three days later, Perry called Dan Naslund, but she reached only his voicemail. After several attempts at reaching Naslund (she did not leave a message), she called Mickey Reynolds and told him that Jackson had sexually harassed her "on a daily basis." Reynolds' contemporaneous notes of that conversation (he wrote down what he considered "most important") reflect three comments attributed to Jackson by Perry: "Do you scream?"; "You need a man in your bed"; and "You need a husband." According to Perry, Reynolds stated that it would be Perry's word against Jackson's, but that he would investigate. Reynolds told Perry that Naslund should also be involved in the investigation, and asked Perry to visit the corporate office to meet with Naslund. He further suggested that Perry work at another store while they investigated her complaint. Perry agreed that she would come to the office to meet with Naslund, but she never did. Nor did she take up Reynolds' offer of employment at a different store.

Reynolds and Naslund each spoke with Jackson about Perry's complaint; Jackson denied making any inappropriate remarks. They also spoke with counter manager Karnia, who once "joked" to one of his workers that if she did not do an assigned task he would "sic Felicia's husband on [her]." Perry overheard the remark, and Reynolds later reprimanded Karnia for having made it. Karnia told Naslund that he had never heard anyone, including Jackson, make inappropri-

---

1. According to the primer, if an employee feels "uncomfortable confronting the [harasser] directly," she is to "promptly and accurately report the misconduct in accordance with [the] sexual harassment policy."

ate remarks to Perry. Based on his conversations with Jackson and Karnia, and on what Perry apparently had told Reynolds, Naslund concluded that "this was not a sexual harassment situation," a conclusion which (from Chernin's perspective) closed Perry's case.

■ But it did not close the case as far as Perry was concerned. She filed suit in the district court claiming sexual harassment and constructive discharge in violation of Title VII of the Civil Rights Act of 1964. 42 U.S.C. § 2000e *et seq.* She survived a motion for summary judgment brought by Chernin's, and even the company's motion for a directed verdict after she completed her case before the jury. But Chernin's renewed its motion for judgment as a matter of law after it completed its own case, and this time the district court agreed, citing no evidence "to show that [Chernin's] had reason to know of the misconduct, and further, that [it] unreasonably failed to take appropriate corrective action." So we have a full trial record before us (with the exception of closing arguments), and our task is to determine if "enough evidence exists that might sustain a verdict for the nonmoving party," in this case Perry. *Continental Bank N.A. v. Modansky,* 997 F.2d 309, 312 (7th Cir.1993).

## II.

■ We review the grant of judgment as a matter of law *de novo, id.,* to determine if the district court was correct in concluding "there [was] no legally sufficient evidentiary basis for a reasonable jury to find for" Perry on her claims. Fed.R.Civ.P. 50(a)(1). We are guided by our recent decision in *Jansen v. Packaging Corp. of Am.,* and *Ellerth v. Burlington Industries, Inc.,* 123 F.3d 490 (7th Cir.1997) (*en banc*) (per curiam), two cases we heard together to determine the appropriate standard of employer liability under Title VII in cases of sexual harassment by a supervisor.

■ The first question in a case like this one is "whether the plaintiff was, because of her sex, subjected to such hostile, intimidat-

ing, or degrading behavior . . . as to affect adversely the conditions under which she worked." *Carr v. Allison Gas Turbine Div., General Motors Corp.,* 32 F.3d 1007, 1009 (7th Cir.1994). Not every unpleasant workplace is a hostile environment. The "occasional vulgar banter, tinged with sexual innuendo, of coarse or boorish workers" would be neither pervasive nor offensive enough to be actionable. *Baskerville v. Culligan Int'l Co.,* 50 F.3d 428, 430 (7th Cir.1995). The workplace that is actionable is the one that is "hellish." *Id.* Drawing the line is not easy; in this case, some of the comments uttered by Jackson were only minimally suggestive, while others were crude and degrading.

■ Sometimes we need not decide whether particular conduct or comments crossed the line and were actionable. This is because even if a plaintiff like Perry can establish a hostile environment based on her sex, it does not necessarily follow that her employer is liable to her under Title VII. Employers are not automatically liable for an environment of sexual harassment created by supervisors or co-workers; employers are liable only when they have been negligent either in discovering or remedying the harassment. *Jansen,* 123 F.3d at 494 (per curiam) (stating that the "law of the circuit" in these cases is "negligence, not strict liability"); id. at 502 (Flaum, concurring) ("it is best to let the standard of liability remain at negligence").[2] *See also Baskerville,* 50 F.3d at 432 (employer's legal duty is "discharged if it takes reasonable steps to discover and rectify acts of sexual harassment of its employees"). The rule is no different in a case where the harasser happens to outrank the victim in the company's hierarchy, as in this case (and as in *Baskerville*). The exception is a case of "quid pro quo" harassment, where submission to a supervisor's sexual demands is made a condition of tangible employment benefits. In that circumstance— one not at play here—liability is strict. *Jansen,* 123 F.3d at 494–95 (per curiam).

---

**2.** Judge Flaum's concurrence provides for a "heightened duty of care" where the harasser is a supervisor rather than a coworker of the plaintiff. That heightened duty would "apply both in terms of the machinery available to employees

to complain of harassment and in terms of a corporation's duty to investigate and respond effectively to such complaints." *Id.* at 502 (Flaum, concurring). Judge Flaum's "height-

At trial Perry conceded she never complained to anyone about the harassment before she quit. In her case, the concession is critical. *See Zimmerman v. Cook County Sheriff's Dep't*, 96 F.3d 1017, 1019 (7th Cir. 1996) (If "the only possible source of notice to the employer" is the employee who is being harassed, she must present evidence "that she gave the employer enough information to make a reasonable employer think there was some probability that she was being sexually harassed"); *Andrade v. Mayfair Mgmt., Inc.*, 88 F.3d 258, 262 (4th Cir. 1996) (affirming judgment setting aside jury verdict in favor of employee where evidence revealed plaintiff did not notify harassing supervisor's boss and employer was not informed of the harassment before plaintiff quit). Nor did any of Perry's coworkers complain on her behalf. Her only chance to save her claim (and send it to the jury) would be if Chernin's had reason to know of the harassment on its own. It is true that Naslund visited the store twice a week, but he saw nothing, and Jackson would have been a fool to press his luck while the corporate boss was around. Still, even Karnia, who was there alongside Perry every day, said he saw nothing. So there is no evidence that Chernin's knew or should have known what Jackson was doing. Imposing liability on Chernin's under these circumstances would constitute strict liability to the employer, which, as noted above, we have narrowly limited in sexual harassment cases. *See Jansen*, 123 F.3d at 494–95 (per curiam).

As in *Andrade*, this is not a circumstance where the victim did not know where to turn. We have detailed the company's anti-harassment policies and employee meetings on the subject. Perry herself stated at trial that she was instructed on several occasions to report any harassment. Chernin's appears to have done its part to prevent and discover harassment, but Perry failed to do hers. And in this circumstance we cannot say Perry's obligation was unreasonable. While Jackson was her supervisor, he was low-level and had minimal power to make decisions affecting her job. His crude remarks usually were personal and not connected to his duties as store manager. In the scheme of things, he was a co-worker who was directly answerable to the same people Perry should have told.

Nor can we find much fault in Chernin's response to Perry's complaint, which she finally made over the telephone after she quit her job. She was asked to come to the corporate office to speak with Naslund and Reynolds, perhaps even to provide them with details and witnesses to the harassment, but she never did. Now she contends their investigation was inadequate, and while there "are plenty of cases of ineffectual responses to serious charges," *Baskerville*, 50 F.3d at 432, this is not to be one of them. When Perry first called Reynolds, he was cautious, indicating she needed witnesses or it would be her word against Jackson's. But Naslund and Reynolds immediately went forward with the investigation, interviewing Jackson and Karnia. Jackson predictably claimed to have done nothing wrong and Karnia, Perry's immediate supervisor, claimed he saw nothing at all. As we said in *Baskerville*, the test is reasonableness, and Chernin's surely found it difficult to investigate several incidents spread over 14 months with no corroboration provided by Perry.

What we are saying is the law against sexual harassment is not self-enforcing. A plaintiff has no duty under the law to complain about discriminatory harassment, but the employer in a case like this one will not be liable if it had no reason to know about it. Nor does a plaintiff have a legal duty to cooperate with the employer's investigation; but the reasonableness of the employer's attempts to rectify harassment is measured against how much it knows or

---

ened duty" approach was supported by Judge Cummings, Judge Evans, Judge Bauer (in *Ellerth*), and Judge Cudahy (in *Jansen*). It was opposed by Chief Judge Posner, Judge Coffey, Judge Manion, and Judge Kanne, and questioned by Judge Diane P. Wood in an opinion joined by Judge Easterbrook and Judge Rovner. Though the approach did not garner support from a majority of the court, it is worth noting that applying it here would not affect our analy-

sis. Presumably the duty of care under a "heightened standard" would depend upon the level of supervisor; employers would be expected to scrutinize the behavior of a high-level executive much more than a low-level supervisor like Jackson. As we discuss below, we are unclear what more Chernin's could have done to discover or remedy the harassment under the circumstances in this case.

should have known. In fact, if Perry's account of events is accurate, her lack of follow-through makes the result in this case an unfortunate one. After all, Naslund did not contend at trial that Perry's allegations were false; he testified that they could not be supported.

 This leaves us with Perry's claim of constructive discharge, which occurs when an employee's discriminatory working conditions become so intolerable that a reasonable person in her position would be compelled to resign. *Rabinovitz v. Pena*, 89 F.3d 482, 489 (7th Cir.1996). In other words, the plaintiff's resignation is not truly voluntary if quitting was the only way she could extricate herself from the intolerable conditions. But unless conditions are beyond "ordinary" discrimination, a complaining employee is expected to remain on the job while seeking redress. *Id.*

 Quitting was not the only option available to Perry: Reynolds offered her work at another store away from Jackson. That offer changed the calculus facing Perry; quite simply, a reasonable person in her position would not have been *compelled* to resign her employment altogether. *See id.* (an employee "must seek redress while remaining in his job unless confronted with an aggravating situation beyond ordinary discrimination"); *cf. Andrade*, 88 F.3d at 262 (testimony that supervisor offered to hold plaintiff's job open for her precluded her constructive discharge suit). Instead of discussing Reynolds' offer with him, Perry rejected it outright. That was her prerogative, but because it revealed that her hands were not tied, and that resignation was not the only choice available to her, it tells us that her constructive discharge claim should not have reached a jury, either.

AFFIRMED.

DIANE P. WOOD, Circuit Judge, concurring.

I agree with the majority that Felicia Perry's claim of sex discrimination, in the form of sexual harassment by store manager John Jackson, was correctly denied under the narrowest grounds supported by a majority of the court in our recent *en banc* decisions in *Jansen v. Packaging Corp. of America and Ellerth v. Burlington Industries*, 123 F.3d 490 (7th Cir.1997) ("Jansen"). I write simply to explain how I would apply the *Jansen*

standards to Perry's case, and briefly how the approach I outlined in *Jansen* would apply.

First, taking the facts brought out at trial in the light most favorable to Perry, there is little question that she would have been entitled to reach the jury on the question whether the environment in which she worked crossed the line from merely unpleasant to "hostile." The real question, though, as the majority rightly notes, is whether a jury could hold Chernin, Inc., responsible for Jackson's behavior. Applying the *Jansen* test, I agree that the answer is no. Jackson evidently took care to make sure that no one else either at the Roosevelt Road store or the company more generally observed his offensive behavior. This is why Karnia never saw anything: what manager, in front of other employees, would use the kind of language Perry alleges Jackson did? As the manager, he had the power to require her presence in more secluded areas, where he could harass unobserved. Judge Flaum noted this leverage in note 4 of his *Jansen* opinion, 123 F.3d at 497 n. 4, and I made a similar observation in my *Jansen* opinion, 123 F.3d at 566–68.

If we were to approach this case as I would have done in *Jansen*, the next question would be whether Jackson was acting within the scope of the authority conferred upon him by Chernin when he committed these acts of harassment. Although Judge Flaum eventually opted for a negligence approach for so-called hostile environment cases, he would have imposed liability in the so-called *quid pro quo* cases only where the supervisor was using authority delegated by the employer. This "delegated authority" concept is very close to my "scope of authority" test. In Perry's case, I would find on this record that she failed to bring forth facts that would show that Jackson was acting within the scope of his authority (or was using his delegated powers). See *Wright v. City of Danville*, 174 Ill.2d 391, 221 Ill.Dec. 203, 211, 675 N.E.2d 110, 118 (1996) (Under Illinois law, "actions [that are] different from the type of acts [an employee is] authorized to perform or ... performed purely in [the employee's] own interest [are] outside the scope of employment.") (citations omitted); *Deloney v. Board of Educ.*, 281 Ill.App.3d 775, 217 Ill. Dec. 123, 129, 666 N.E.2d 792, 798 (1996) ("In the context of respondeat superior liability, the term 'scope of employment' excludes con-

duct by an employee that is solely for the benefit of the employee.") (citations omitted). Apparently the majority would also view the record this way, as they have observed that Jackson was "low-level and had minimal power to make decisions affecting her job. His crude remarks usually were personal and not connected to his duties as store manager." *Ante* at 1014. Those few actions he took that went beyond the personal would not, standing alone, have been enough to support a hostile environment claim. They would instead have been the kind of sporadic misbehavior that is not actionable under our cases. *E.g., Saxton v. American Tel. & Tel. Co.,* 10 F.3d 526, 533 (7th Cir.1993) (" '[R]elatively isolated' instances of non-severe misconduct will not support a hostile environment claim.") citing *Weiss v. Coca–Cola Bottling Co.,* 990 F.2d 333, 337 (7th Cir.1993). Therefore, I too would apply a negligence standard to this case, because it is the default standard once the conduct is shown not to be within the scope of the supervisor's employment.

Naturally, the same result follows under an attempt to distill the highest common factors from our many opinions in *Jansen.* Chernin can be held liable only if it was negligent in failing to discover or to remedy the harassment, and nothing indicates that its response was wanting when Perry finally complained. She herself dropped the ball when she did not meet with Dan Naslund as requested and did not in any other way supply "leads" to Chernin. (I note, however, that in her case as in many other sexual harassment cases, the harasser may have been careful not to leave any kind of trail. The company basically had a credibility decision to make, and it resolved doubts in favor of its manager. I fear this will often be the case when subordinates complain about their superiors under a company's harassment policy. Victims of harassment may need to find creative ways to document their problems if they wish to be taken seriously.)

Finally, I agree that Perry's claim of constructive discharge should not have reached the jury, for the reasons stated by the majority.

I therefore concur in the result.