142 F.3d 441
 NOTICE: Seventh Circuit Rule 53(b)(2) states unpublished orders shall not be cited or used as precedent except to support a claim of res judicata, collateral estoppel or law of the case in any federal court within the circuit.
Larry WHITE, Sr., Plaintiff-Appellant,
v.
The MONEY STORE, Defendant-Appellee.
 No. 97-3056.
 United States Court of Appeals,
Seventh Circuit.
 .
Argued March 3, 1998
Decided March 17, 1998.
 
 Appeal from the United States District Court for the Northern District of Illinois, Eastern Division, No. 96 CV 5955, Charles P. Kocoras, Judge.
 Before Hon. JESSE E. ESCHBACH, Hon. JOHN L. COFFEY, and Hon. ILANA DIAMOND ROVNER, Circuit Judges.
 
 ORDER
 
 1
 Larry White, Sr., an African-American, filed a complaint against his former employer, The Money Store ("TMS"), alleging that he was constructively discharged from his job because he was subjected to a racially hostile work environment, in violation of Title VII of the Civil Rights Act of 1964. 42 U.S.C. § 2000e et seq. The district court granted the defendant's motion for summary judgment concluding that White could not establish a prima facie case of a racially hostile work environment. The court further found that White failed to present facts indicating that the alleged harassment was racially motivated, and that he therefore could not sustain a claim for constructive discharge. White appeals. We affirm.
 
 I. FACTS
 
 2
 The following facts are undisputed, as they were taken from TMS's Rule 12(M) Statement and not properly denied by White in his Rule 12(N)(3)(a) Response. TMS is a mortgage company that provides loans to borrowers throughout the United States. In March 1994, White began working for TMS as an account executive in the Wholesale Division. Shortly after he was hired he received an employee manual that prohibited racial harassment and outlined the procedures to take to rectify harassment in the workplace. The procedure called for an aggrieved employee to provide a written complaint to either his supervisor, a division president, or a Human Resources representative.
 
 
 3
 In approximately January or February 1995, Keith Bergfeld, a white male, was promoted to the position of Sales Director and became White's manager at TMS. As a sales director, Bergfeld supervised several account executives at TMS. Each account executive was typically assisted by loan processors and production assistants, who reported to Lisa Touch, an Operations Manager at TMS. In July 1995, the Wholesale Division was reorganized to create a team concept, where each team was managed by an account executive who was assisted by loan processors and production assistants. Under the team concept, the loan processors and production assistants began to report to their supervising account executive rather than to Lisa Touch.
 
 
 4
 As part of the reorganization, Bergfeld was given the title of vice-president of sales and continued to supervise the teams in the Central Two Region, which included White's team. Bergfeld's position was at most a middle management position in TMS's corporate structure. He did not make policy decisions but merely implemented the policies established by his superiors.
 
 
 5
 Following the reorganization, account executives were responsible for their team's overall product quality and adherence to company policy and procedures. However, all account executives, including White, were required to confer with Bergfeld about hiring, firing, and disciplinary matters. Bergfeld, in turn, was required to confer with a senior vice-president on these decisions.
 
 
 6
 In July 1995, White complained to Bergfeld about the performance of Cathy Miller, one of his production assistants, and provided Bergfeld with a Memorandum of Deficiency, which White desired to provide to Miller. In response, Bergfeld talked with Miller and Lisa Touch about Miller's performance. Miller stated that she felt her problems were a result of White pushing her too hard and Touch stated that she had been pleased with Miller's work when she was under her supervision. Due to this conflicting assessment of Miller, Touch and a senior vice-president instructed Bergfeld to laterally transfer Miller into the position of Operations Specialist in a different office.
 
 
 7
 In the Fall of 1995, MaryAnn DeArvil, a white account executive under Bergfeld's supervision informed him that a loan officer on one of her accounts was leaving his job to work for a new branch of Dolphin Mortgage ("Dolphin"). Although White handled several other Dolphin branches, Bergfeld decided to assign DeArvil to service Dolphin's new branch because he believed that her relationship with the loan officer would allow her to generate significant business with the branch. It was not uncommon for different account executives to service different branches of the same company, and Bergfeld had even taken accounts from one account executive and assigned them to another when he believed it would result in greater revenue production. White did not lose any of his existing accounts with Dolphin branches as a result of DeArvil's assignment to the new Dolphin branch.
 
 
 8
 In November 1995, the office that White worked in for TMS was moved from Hickory Hills to Burr Ridge, Illinois. White and a white account executive had similar offices and both believed that it was unfair for their teams to have to work in such close quarters. However, the space provided was similar to that for other offices in the Central Region.
 
 
 9
 In December 1995, while Bergfeld was visiting the Underwriting Department, he was notified that the department was concerned about the quality and integrity of loan documents submitted by White's team. Bergfeld had White meet with him at Bergfeld's office in Indianapolis, at which time White admitted that he needed to become more involved with his team. Bergfeld had previously asked other white account executives to meet with him in Indianapolis and White never complained to Bergfeld about having to travel to Bergfeld's office for the meeting.
 
 
 10
 On or about November 27, 1995, Bergfeld received a memorandum indicating that one of the loans submitted by White's team was in default. An attachment to this memorandum indicated that the property securing the loan was vacant, which is in direct conflict with TMS policy. White disputes that the property was vacant and stated at his deposition that the property "probably was not vacant at the time of closing."
 
 
 11
 Thereafter, Bergfeld traveled to Burr Ridge to review files relating to White's team because of the concern expressed by the Underwriting Department and White's desire to discipline his production assistant, Donna Davis. Bergfeld reviewed about 12 files and found numerous violations of company policies and potential violations of the Real Estate Settlement Procedure Act. A senior vice-president and the Human Resources Department directed Bergfeld to issue Davis a Letter of Warning because she was personally responsible for submitting incomplete and improper loans. Bergfeld was also directed to issue White a Counseling Statement because he failed to ensure that his team submitted complete and proper files. A Counseling Statement is a less severe disciplinary action than a Letter of Warning. Shortly thereafter, Bergfeld terminated Davis for violating another company policy.
 
 
 12
 Following Davis's termination, Bergfeld assigned Cathy Miller to temporarily fill the vacancy created by Davis's termination. Because of prior conflicts between White and Miller, Bergfeld asked White to discuss any concerns that White might have about working with Miller. White replied that he understood the situation and would handle it on a professional level. While Miller was filling the vacancy in Burr Ridge, she retained the title of Operations Specialist and reported to Bergfeld. In the past, Bergfeld had filled similar vacancies with Operations Specialists who continued to report to him.
 
 
 13
 In early January 1996, Bergfeld learned that White had released a commission check to a broker during a three-day rescission period for a refinance loan. This was a violation of company policy. Due to this violation and the prior problems relating to Davis's termination, a senior vice-president directed Bergfeld to send White a memorandum in which he delayed granting White check writing authority. White had never had check writing authority and the authority to write checks did not enhance his ability to function as an account executive. In the memorandum sent to White, Bergfeld stated that he was convinced that White would continue to produce a large volume of business for TMS.
 
 
 14
 On February 1, 1996, White phoned Paula L'Esperance of the Human Resources Department to discuss benefits issues for two African-American employees. At the conclusion of this conversation he stated that he was upset about his receipt of the Counseling Statement from Bergfeld on December 28, 1995, and that he believed it was too harsh of a measure. During this conversation, L'Esperance inquired whether White believed that he was being discriminated against, to which White replied that he did not want to label his treatment as discrimination. Two weeks later, L'Esperance placed a follow-up call to White to see how he was doing. Although White stated that he was frustrated over his relationship with Bergfeld he once again declined to state that he believed he was being discriminated against.
 
 
 15
 On or about March 1, 1996, Bergfeld distributed a "Star Performers" list that awarded account executives points based on their volume, units, and weighted average coupon ("WAC")[1]. The purpose of this list was to instill competition among account executives. Apparently there was an inaccuracy on this list either in White's WAC or on the points that he was given, because the list indicated that he had the highest WAC yet he did not receive the most points. White did not bring this error to Bergfeld' attention and Bergfeld did not become aware of it until White's deposition.
 
 
 16
 On March 15, 1996, White resigned from TMS. It was not until White submitted his letter of resignation that he alleged a racially hostile work environment. Once L'Esperance received White's letter of resignation she contacted him to discuss his resignation and set up a meeting for him with Jerri Hunt, a member of TMS's Human Resources Department to discuss his complaint. White originally agreed to this meeting but later canceled his appointment. Nevertheless, Hunt conducted an investigation of White's allegations and interviewed approximately a dozen individuals, but was ultimately unable to substantiate any instances of discrimination or racial harassment.
 
 
 17
 White admits that no one at TMS ever stated that they were going to take an action against him because of his race or that race was a factor in decisions. However, on two occasions, once while White was employed by TMS and once after he resigned, the department that White worked in was referred to as the "dark side." On neither occasion was this term stated directly to White. Another African-American employee, Robert Ivens, heard the term on each occasion and then informed White. The individuals who used this term were a processor and a vice president in the Retail Division and were not White's supervisors. TMS argues that the term the "dark side" was used to refer to the Wholesale Division because, unlike the Retail Division, the Wholesale Division works with brokers rather than customers.[2]
 
 
 18
 Although White claims that two other African-American employees were terminated after they reported harassment, he admits that he does not specifically know why they were terminated. He further admits that the Human Resources Department investigated the complaints of discrimination and that he has no reason to believe that the investigations were unfair.
 
 II. DISCUSSION
 A. Standard of Review
 
 19
 This court reviews a district court's grant of summary judgment de novo. Venters v. City of Delphi, 123 F.3d 956, 962 (7th Cir.1997); Oates v. Discovery Zone, 116 F.3d 1161, 1165 (7th Cir .1997). "Summary judgment is appropriate when the record, viewed in a light most favorable to the non-moving party, reveals that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Vector-Springfield Properties, Ltd. v. Central Ill. Light Co., Inc. ., 108 F.3d 806, 809 (7th Cir.1997) (citing Fed.R.Civ.P. 56(c)). In order for a party "to avoid summary judgment that party must supply evidence sufficient to allow a jury to render a verdict in his favor ." Williams v. Ramos, 71 F.3d 1246, 1248 (7th Cir.1995). A claimant must present more than conclusory allegations to defeat a motion for summary judgment. Mills v. First Fed. Sav. & Loan Ass'n of Belvidere, 83 F.3d 833, 840 (7th Cir.1996). The mere existence of some alleged factual dispute is insufficient to defeat an otherwise properly supported motion for summary judgment. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).
 
 
 20
 B. Failure to Comply with Local Rule 12(N)(3)
 
 
 21
 As the district court clearly indicated, White failed to comply with Local Rule 12(N)(3), which provides that each party opposing a motion for summary judgment shall file:
 
 
 22
 (3) a concise response to the movant's [Rule 12(M) ] statement that shall contain:
 
 
 23
 (a) a response to each numbered paragraph in the moving party's statement, including, in the case of any disagreement, specific references to the affidavits, parts of the record, and other supporting materials relied upon, and
 
 
 24
 (b) a statement, consisting of short numbered paragraphs, of any additional facts that require the denial of summary judgment, including references to the affidavits, parts of the record, and other supporting materials relied upon. All material facts set forth in the statement required of the moving party will be deemed to be admitted unless controverted by the statement of the opposing party.
 
 
 25
 U.S. Dist. Ct., N.D.Ill., Gen. R. 12(N)(3). White repeatedly failed to admit or deny TMS's Rule 12(M) numbered paragraphs of material facts in violation of Rule 12(N)(3)(a), and instead sought to clarify TMS's factual assertions with his own assertions. White violated Rule 12(N)(3)(a) despite the fact that subsection (b) allows a party to raise additional facts after responding to each of a party's Rule 12(M) assertions. This court "usually review[s] an entry of summary judgment by construing the facts and inferences most favorably to the non-moving party." Brasic v. Heinemann's Inc., 121 F.3d 281, 284 (7th Cir.1997). However, because White failed to comply with Rule 12(N)(3) for many of TMS's factual assertions, those facts are uncontested, and should be assumed as correct by this court. Id.; see Midwest Imports, Ltd. v. Coval, 71 F.3d 1311, 1316 (7th Cir.1995) ("We have consistently and repeatedly required strict compliance with rule 12(N)."). Moreover, White does not challenge the district court's decision with respect to White's violation of Rule 12(N)(3) and therefore has waived any such argument. Estate of Phillips v. City of Milwaukee, 123 F.3d 586, 597 (7th Cir.1997) (arguments not presented in initial brief on appeal are waived), cert. denied, --- U.S. ----, 118 S.Ct. 1052, 140 L.Ed.2d 115, 66 U.S.L.W. 3459 (U.S. Feb. 23, 1998) (No. 97-1082).
 
 
 26
 White cites to Highsmith v. Chrysler Credit Corp., 18 F.3d 434, 439-40 (7th Cir.1994), for the proposition that on appeal he may submit new factual allegations provided they are consistent with the assertions in his complaint. This argument is unavailing because Highsmith addressed the proper review of a dismissal for failure to state a claim, Fed.R.Civ.P. 12(b)(6), rather than a motion for summary judgment, Fed.R.Civ.P. 56(c). See Berwick Grain Co., Inc. v. Illinois Dep't of Agric., 116 F.3d 231, 234 (7th Cir.1997) ("The appellate stage of the litigation process is not the place to introduce new evidentiary materials.") Therefore, this court assumes as correct all of the factual assertions in TMS's Rule 12(M) statement that were supported with specific references to the record or other supporting materials, and were not denied by White in accordance with Rule 12(N)(3)(a).
 
 C. Hostile Work Environment
 
 27
 "Title VII of the Civil Rights Act of 1964 prohibits an employer from engaging in racial harassment that creates a hostile or offensive working environment." Rodgers v. Western-Southern Life Ins. Co., 12 F.3d 668, 674 (7th Cir.1993). "Title VII affords employees the right to work in an environment free from discriminatory intimidation, ridicule, and insult." Meritor Sav. Bank, FSB v. Vinson, 477 U.S. 57, 65, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986) (citing Rogers v. EEOC, 454 F.2d 234 (5th Cir.1971)).
 
 
 28
 The district court stated that in order to establish a prima facie case of a hostile work environment on the basis of race, an employee must demonstrate that: (1) he is a member of a protected class; (2) was subject to unwelcome harassment; (3) the harassment was on the basis of race; (4) the harassment was sufficiently severe or pervasive so as to alter the conditions of the victim's employment and to create an abusive working atmosphere; and (5) there is some basis for employer liability for the harassment. To support the use of this multi-factor test, the district court relied on Johnson v. Teamsters Local Union No. 559, No. Civ.A. 87-00215-FHF, 1995 WL 355304, 67 Fair Empl.Prac.Cas. (BNA) 1150 (D.Mass. Mar.31, 1995). The district court found that White had failed to satisfy at least the last three factors in this test.
 
 
 29
 On appeal, TMS argues that the district court used the appropriate prima facie analysis and cites to Swanson v. Elmhurst Chrysler Plymouth, Inc., 882 F.2d 1235, 1238 (7th Cir.1989), and Pasqua v. Metropolitan Life Ins. Co., No. 94 C 4418, 1995 WL 683772, at * 3 (N.D.Ill. Nov.16, 1995). Although this court used this five factor test to analyze a sexual harassment claim in Swanson and the factors do outline requirements for a successful claim, this circuit has subsequently declined to apply a multi-factor test in the hostile work environment context.
 
 
 30
 "[T]his court declined to adopt a multi-factor test for Title VII harassment claims because such a test 'has the potential for a mechanical application that overlooks or underemphasizes the most important features of the harassment inquiry.' " Rodgers, 12 F.3d at 674 (quoting Daniels v. Essex Group, Inc., 937 F.2d 1264, 1271 (7th Cir.1991)); see Daniels, 937 F.2d at 1270-71 (reviewing multi-factor tests for harassment claims used by other courts and explaining why they are inappropriate). Instead, this court reviews Title VII harassment claims under both an objective and subjective standard. Id.; Harris v. Forklift Systems, Inc., 510 U.S. 17, 21, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993). "[T]his conjunctive approach allows us to consider 'the likely effect of a defendant's conduct upon a reasonable person's ability to perform his or her work and upon his or her well-being as well as the actual effect upon the particular plaintiff bringing the claim.' " Id. (quoting Brooms v. Regal Tube Co., 881 F.2d 412, 419 (7th Cir.1989) (sexual harassment claim)).
 
 
 31
 For a racially hostile work environment claim " 'to be actionable, it must be sufficiently severe or pervasive so as to alter the conditions of the victim's employment and to create an abusive working atmosphere.' " Drake v. Minnesota Mining & Mfg. Co., No. 97-1809, slip op. at 10 (7th Cir. Jan.21, 1998) (quoting McKenzie v. Illinois Dep't of Transp., 92 F.3d 473, 479 (7th Cir .1996)). This court has noted that "isolated and innocuous incidents will not support a hostile environment claim." McKenzie, 92 F.3d at 480. Additionally, employer liability is under a negligence, rather than strict liability, standard in hostile work environment cases. Jansen v. Packaging Corp. of Am., 123 F.3d 490, 495 (7th Cir.1997) (per curiam). Even when an employee's supervisor creates an environment of racial harassment, "employers are liable only when they have been negligent either in discovering or remedying the harassment." Perry v. Harris Chernin, Inc., 126 F.3d 1010, 1013 (7th Cir.1997).
 
 
 32
 White presents a litany of factual assertions to support his allegations that he was subjected to a hostile work environment on the basis of his race. He argues that a racially hostile work environment is evidenced by the following: (1) a different account executive, who was white, was assigned to the new Dolphin Mortgage branch; (2) he was not allowed to discipline white employees, but could discipline an African-American employee; (3) he learned that on one occasion while he was employed at TMS, and that on a second occasion after his resignation, the division he worked in was referred to as the "dark side;" (4) his team received inferior work facilities to those that white account executives' teams received; (5) a company reception included a skit where a group of "slaves" carried out the sister of the president of TMS; (6) he did not receive the proper amount of points for having the highest WAC; (7) minorities were discharged, while whites who performed at comparable levels were retained; (8) he was denied promotional opportunities; (9) he was held accountable and disciplined for errors of incompetent white employees; and (10) he was forced to work with Miller after he had recommended that she be disciplined for poor performance. Despite White's numerous assertions, for the most part he fails to support them with anything other than his own speculation or conclusions. With a few exceptions, he cites to only his own deposition or the list of 14 allegations that he submitted to the EEOC. However, White's self-serving assertions are not evidence of a hostile work environment. Mills, 83 F.3d at 840. Additionally, some of his factual assertions were not properly presented to the district court and therefore are not considered on appeal. Brasic, 121 F.3d at 284; Midwest Imports, 71 F.3d at 1316. However, even if White could establish that he was harassed on the basis of race, his claim would still ultimately fail because he cannot show that TMS was negligent in discovering or remedying the harassment. Jansen, 123 F.3d at 495; Perry, 126 F.3d at 1013.
 
 
 33
 White's inability to establish that TMS was negligent either in discovering or remedying the alleged harassment is crucial to his claim. At the time that White was hired, he was provided with an employee manual which stated that racial harassment was prohibited and outlined a means for reporting such harassment to management or the Human Resources Department. White admits that, despite his receipt of the manual, he did not tell anyone in management or the Human Resources Department that he thought he was being harassed on the basis of his race until he submitted his resignation.
 
 
 34
 In this case, White was aware of the procedure for reporting prohibited harassment but failed to follow the procedures, even when L'Esperance specifically asked him if he believed he had been discriminated against and instructed him to bring to her attention any suspected discrimination. Therefore, because TMS had no direct knowledge of any harassment, in order to find TMS negligent White would have had to present evidence that he gave his employer sufficient information to make a reasonable employer aware that there was some probability that he was being racially harassed. Perry, 126 F.3d at 1014 (citing Zimmerman v. Cook County Sheriff's Dep't, 96 F.3d 1017, 1019 (7th Cir.1996)). In Perry, this court held that an employer was not responsible for the alleged sexual harassment because the employee failed to report the harassment prior to her resignation. Id. Just as in Perry, White failed to inform TMS of his belief that he was subjected to a racially hostile work environment. Therefore, we affirm the district court's decision on the basis that White has failed to establish negligence on the part of TMS.
 
 D. Constructive Discharge and Waived Claims
 
 35
 This leaves the court to consider White's constructive discharge claim. A constructive discharge occurs when an employee's discriminatory working conditions are so intolerable that a reasonable person in his position would be compelled to resign. Perry, 126 F.3d at 1015. The conditions must be beyond ordinary discrimination and "a complaining employee is expected to remain on the job while seeking redress." Id. (citing Rabinovitz v. Pena, 89 F.3d 482, 489 (7th Cir.1996)). White's claim fails because he failed to pursue the avenues available for redress. Id. Therefore, we conclude that White did not raise a genuine issue of material fact that he was constructively discharged.
 
 
 36
 On appeal, White claims that in addition to being subject to a hostile work environment and constructively discharged, he was denied a promotion because of his race and that TMS engaged in a pattern or practice of racial discrimination. This claim is waived because White failed to raise it in either his EEOC charge or his complaint. Cheek v. Peabody Coal Co., 97 F.3d 200, 202 (7th Cir.1996).
 
 III. CONCLUSION
 
 37
 White has failed to present evidence that TMS was negligent either in discovering or remedying the alleged harassment. His claim of constructive discharge is unavailing because he did not seek the available redress before resigning from his position. Finally, he has waived his failure to promote claim.
 
 
 38
 AFFIRMED.
 
 
 
 [1]
 WAC is not defined in the record, but it was apparently one factor used to rate performance
 
 
 [2]
 The two sources that TMS cites to support this assertion are not present in the record before this court