# In the
# United States Court of Appeals
## For the Seventh Circuit

---

No. 06-1617

TODD P. BERNIER,

*Plaintiff-Appellant,*

*v.*

MORNINGSTAR, INC.,

*Defendant-Appellee.*

---

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 04 C 6924—**Blanche M. Manning**, *Judge.*

---

ARGUED NOVEMBER 7, 2006—DECIDED JULY 17, 2007

---

Before EASTERBROOK, *Chief Judge*, and POSNER and
WOOD, *Circuit Judges.*

WOOD, *Circuit Judge.* In this case, Todd Bernier thought
that he was the victim of employee-on-employee, same-
sex harassment at the workplace of Morningstar, Inc., an
investment research firm. He claimed that Morningstar's
failure to prevent his fellow employee, Christopher Davis
(who is gay), from sexually harassing him amounted to
unlawful sex discrimination. Bernier, however, did not
alert Morningstar to his concerns through the complaint
procedure Morningstar has adopted. Instead, he sent an
anonymous instant message to Davis, who was alarmed
enough by it to report it to company management. Human
Resources personnel traced the message to Bernier and by

the following Monday, it was Bernier who found himself out of a job. Bernier sued Morningstar under Title VII, but the district court granted the firm's motion for summary judgment, on the ground that there is no basis for employer liability on these facts, nor does any evidence suggest retaliation. We agree with that assessment and affirm.

# I

Bernier began his career at Morningstar in late 1999 as an equity analyst; by 2002, he held the position of associate director of equity research. Bernier alleges that in January 2003, Davis (a mutual fund analyst) started staring at him whenever the two passed in the hallway or when Davis was near Bernier's work area. Bernier experienced increasing discomfort with Davis's behavior. About a year later, on Friday, January 23, 2004, Bernier noticed Davis taking "an overt, purposeful and glaring look" at Bernier's penis while they were both standing at the urinals in the men's bathroom on their floor. Bernier knew that Davis was gay—he had learned this in 2003, some time after Davis brought a male date to the company's 2002 Christmas party—but he was not aware until this litigation commenced that Davis had a "lazy" left eye that sometimes made it appear that he was "looking off at something" when conversing. Bernier assumed that Davis was sexually interested in him because other gay men that Bernier knows do not stare at him.

Although Bernier felt sexually harassed by Davis, he did not take advantage of Morningstar's sexual harassment complaint procedure to notify the company of Davis's behavior. Instead, he sent Davis an anonymous instant message through a little-used internal system. The message, which popped up on Davis's computer without warning, said, "Stop staring! The guys on the floor don't

like it." Davis, under the impression that *he* was being harassed for being gay, promptly notified Morningstar's Human Resources department. The following Monday, Human Resources personnel and Bernier's supervisors confronted him with the message; he was fired a few hours after he denied having sent it.

Davis (but not Bernier) had followed exactly the path recommended in Morningstar's policy prohibiting sexual harassment, which had been in effect for the entire time while Bernier was employed at the firm. The policy provided a simple procedure for notifying the company of a complaint: The employee who believed that he or she had been harassed was directed to "discuss it immediately with your manager or the Human Resources department." It further noted, "This complaint procedure is a critical component of Morningstar's efforts to maintain a workplace free of harassment. Employees are strongly urged to utilize it, and are assured that the company will not retaliate against them for doing so."

Morningstar employees were given further information on whom to notify in the event of harassment in a document they received entitled "Managing to Prevent Harassment—Participant's Guide." The Guide posed the hypothetical question, "To whom should an employee at your company complain about harassment?" The response it offered was to "[l]ook at company's policy to determine the answer. The answer is not a co-worker or the harasser. Complaints to co-workers do not put the company on notice of the harassment. Complaints to the harasser are encouraged, but cannot be required."

Matters might have been different if Bernier had taken the "encouraged" path and confronted Davis directly with his accusation. But he neither did that, nor did he discuss the problem with Human Resources or his supervisor, Pat Dorsey. As we noted earlier, he chose instead to

act anonymously, using a little-used internal system to send an instant message that appeared on Davis's computer. Davis was particularly surprised by the message because it was the first time he had ever seen one sent through the company's system. Davis believed that the content of the message and the lengths to which the sender went to ensure that it was untraceable reflected anti-gay animus.

In fact, Bernier underestimated the resources of the company's information technology department. Davis's supervisor, Emily Hall, showed him how to print the instant message and suggested that he contact Human Resources. Davis followed that advice and showed the message to Jane Fitzpatrick, who was the Human Resources representative responsible for his unit at Morningstar. Fitzpatrick had the network administrator investigate the source of the message, which he concluded was Bernier's computer. After Bernier left for the evening, Fitzpatrick confirmed that the message had been sent from his machine. Fitzpatrick then told Bernier's supervisor, Dorsey, and Haywood Kelly, Dorsey's supervisor and Morningstar's editor-in-chief, about the incident.

On the next business day, Monday, January 26, Fitzpatrick, Dorsey, and Kelly met with Bernier in a conference room. They showed him the message and asked him whether he had sent it. Bernier denied having done so. (The parties dispute whether Bernier denied knowing anything about the message, but we need not decide who is right.) Following his denial, Bernier was told he could go. Fitzpatrick, Dorsey, and Kelly concluded that Bernier should be terminated, and Fitzpatrick subsequently obtained the approval of Morningstar's director of Human Resources, Cathy Rezy, and the president of the Retail Business Unit (the strategic business unit in which Bernier worked), Cathy Odelbo, to do so.

Around 4:00 p.m., Fitzpatrick and Dorsey met with Bernier and gave him the bad news.

Only then did Bernier admit that he had sent the message and offer an explanation for his actions to Fitzpatrick and Dorsey. Bernier claims that he had wanted to explain himself earlier in the day and had attempted to speak with Kelly and Dorsey, but that they both referred him to Fitzpatrick. His effort to reach Fitzpatrick was unsuccessful because she was away from her desk. Following his termination, Bernier filed a complaint with the Equal Employment Opportunity Commission, received his right-to-sue letter, and filed this action under Title VII, 42 U.S.C. § 2000e-5(f)(1).

## II

Our review of the district court's summary judgment in Morningstar's favor is *de novo. Hall v. Bodine Elec. Co.*, 276 F.3d 345, 352 (7th Cir. 2002). We take the facts in the light most favorable to Bernier, but we will affirm if there are no disputed issues of material fact and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 316, 322 (1986).

### A.  Sexual harassment claim

Bernier's first claim is that he was subjected to a pattern of sexual harassment in violation of Title VII, 42 U.S.C. § 2000e-2. Since 1986, the Supreme Court has recognized that Title VII's prohibition against discrimination in employment on the basis of sex encompasses sexual harassment that is sufficiently severe or pervasive to alter the employee's terms or conditions of employment. See *Meritor Sav. Bank FSB v. Vinson*, 477 U.S. 57 (1986);

see also *Pennsylvania State Police v. Suders*, 542 U.S. 129 (2004); *Faragher v. City of Boca Raton*, 524 U.S. 775 (1998); *Burlington Indus. v. Ellerth*, 524 U.S. 742 (1998); *Oncale v. Sundowner Offshore Services, Inc.*, 523 U.S. 75 (1998); *Harris v. Forklift Sys., Inc.*, 510 U.S. 17 (1993). *Oncale* clarified that the statute reaches same-sex harassment. See 523 U.S. at 79-80.

Bernier's theory is that Morningstar subjected him to a hostile workplace environment because of Davis's sexual interest in him. "One of the ways in which Title VII's prohibition against sex discrimination in the terms and conditions of employment may be violated is through sexual harassment that is either severe or pervasive enough to create an abusive working environment." *Jackson v. County of Racine*, 474 F.3d 493, 499 (7th Cir. 2007). In deciding whether sexual harassment has reached the point of affecting terms and conditions of employment, we ask whether the complaining person has been subjected to objectively offensive behavior, whether there is a link between that treatment and his or her protected characteristic (here, sex), and whether the conditions are offensive from a subjective standpoint. *Id.*; see also *Parkins v. Civil Constructors of Ill., Inc.*, 163 F.3d 1027, 1032 (7th Cir. 1998).

This, however, is not enough to support a finding of employer liability. "Even if a plaintiff . . . can establish a hostile environment based on h[is] sex, it does not necessarily follow that h[is] employer is liable to h[im] under Title VII." *Perry v. Harris Chernin, Inc.*, 126 F.3d 1010, 1013 (7th Cir. 1997). Instead, where, as here, plaintiff attempts to hold the employer liable for the actions of a co-worker, "the plaintiff bears the burden of showing that the employer knew of the problem (usually though not always this requires the employee to show that a complaint was made) and that the employer did not act

reasonably to equalize working conditions once it had knowledge." *Dunn v. Washington County Hospital*, 429 F.3d 689, 691 (7th Cir. 2005). See also *Doe v. Oberweis Dairy*, 456 F.3d 704, 716 (7th Cir. 2006) (holding that if the harasser "is a coworker, the employer is liable only if it failed to have and enforce a reasonable policy for preventing harassment, or in short only if it was negligent in failing to protect the plaintiff from predatory coworkers"). As *Dunn* pointed out, this is a form of direct, not vicarious, liability. 429 F.3d at 691. Accordingly, "[a]n employer satisfies its legal duty in coworker harassment cases 'if it takes reasonable steps to discover and rectify acts of . . . harassment of its employees.'" *Cerros v. Steel Technologies, Inc.*, 398 F.3d 944, 952 (7th Cir. 2005) (quoting *Parkins*, 163 F.3d at 1032).

We have recognized on many occasions that an employer's "notice or knowledge of the harassment is a prerequisite for liability." *Parkins*, 163 F.3d at 1035 (citing *Perry*, 126 F.3d at 1014). This requirement can in certain circumstances present an unfortunate paradox for plaintiffs: while they have "no duty under the law to complain about discriminatory harassment," *Perry*, 126 F.3d at 1014, if they do not complain then it is possible (perhaps even likely) that the employer will have no knowledge of the problem and hence no duty to act. This possibility is particularly acute when the individual who has been harassed is the only source of information, as opposed to circumstances where a complaint comes from someone other than the plaintiff or where the "sheer pervasiveness" of harassment might support an inference of employer knowledge. *Zimmerman v. Cook County Sheriff's Dep't*, 96 F.3d 1017, 1018 (7th Cir. 1996). To avoid summary judgment, Bernier therefore had to present evidence showing that he "gave the employer enough information to make a reasonable employer think there was some

probability that []he was being sexually harassed." *Id.* at 1019.

Bernier concedes that he did not use Morningstar's established sexual harassment policy. (He explained in his deposition that he did not want to discuss the behavior with either the Human Resources department or his supervisor. Part of his motivation seems to have been his erroneous belief that the instant message could not be printed or forwarded and thus his anonymity would be preserved.) He argues, however, that Morningstar indirectly received actual notice of Davis's alleged harassment of him. We confess that his line of reasoning strikes us as tortuous, but we set it out in the interest of completeness. Bernier argues that a reasonable factfinder could conclude that after Fitzpatrick saw the copy of the instant message that Davis gave him and management figured out that Bernier was the sender, the firm as a whole must have realized that *Bernier* thought that Davis was sexually harassing him. The idea that the message "Stop staring! The guys on the floor don't like it" somehow communicated all of this to Morningstar is too far-fetched to accept. Nothing in that message immediately calls sexual harassment to mind, and a message on behalf of "the guys" says little or nothing about whom the speaker represents or how strong the dislike may be.

While this would be true even had Bernier conveyed his antipathy to the staring to management directly, it applies with even greater force given the way that Fitzpatrick received the message. Davis gave it to her because he thought that *he* was the target of harassment because of his sex and sexual orientation. As Fitzpatrick, Dorsey, and Kelly all testified in their depositions, they understood the message to reflect animus toward either Davis's sexual orientation or perhaps his lazy eye. In this context, Morningstar's focus was on ensuring that the work environment was not hostile for Davis. Bernier acknowledges this in his Rule 56.1 statement of facts,

where he notes that Rezy, the head of Morningstar's Human Resources department, was concerned about the content of the message and the "possible violation of Defendant's anti-harassment policy, if the email was intended to harass." Once Davis put Morningstar on notice that he felt sexually harassed, the firm was obligated to take reasonable steps to investigate, and if necessary to remedy the harassment. By denying that he sent the message—the one clear opportunity he had for ensuring that Morningstar knew that he was (very) indirectly complaining about sexual harassment—Bernier reinforced his supervisors' conclusions.

Bernier also argues that the facts, interpreted favorably to him, show that Morningstar had constructive notice of Davis's alleged harassing behavior. He claims that after the initial meeting, at which he lied, he wanted to explain to Kelly, Dorsey, and Fitzpatrick that he felt harassed. He tried to speak with Kelly and Dorsey and instead was referred to Fitzpatrick. That effort was frustrated when he could not locate her during the time between the meeting and his firing. In his mind, this amounted to the managers' purposely making themselves unavailable and preventing him from making effective use of the formal complaint process. Once again, we are confident that no rational finder of fact could squeeze that interpretation out of these facts. Bernier failed to show, in his opposition to the summary judgment motion, that Morningstar had either actual or constructive notice of Davis's alleged harassment.

Since there is no basis for employer liability on the sexual harassment claim, we have no need to examine the merits of Bernier's charge. It appears, however, that he would have an uphill battle there, too, as Morningstar would undoubtedly claim that it is undisputed that it did not know about the alleged harassment before January 23, 2004, and that the minute it tried to investigate the charge, Bernier lied to the responsible managers.

B.  Retaliation claim

That brings us to Bernier's second claim, which is that Morningstar retaliated against him by firing him after he complained about Davis's sexual harassment. Title VII protects individuals who complain to their employers about sexual harassment from retaliation on that basis. 42 U.S.C. § 2000e-3. The fact that his sexual harassment claim was properly dismissed has no impact on this claim, as a "plaintiff need not prevail on h[is] Title VII claim or have opposed an action that in fact violated Title VII in order to win on a retaliation claim." *Fine v. Ryan Int'l Airlines*, 305 F.3d 746, 752 (7th Cir. 2002).

Like other Title VII claims, retaliation claims may be approached under either a direct or an indirect method of proof:

> The plaintiff in a retaliation case should have two (and only two) distinct routes to obtaining/preventing summary judgment. One . . . is to present direct evidence (evidence that establishes without resort to inferences from circumstantial evidence) that he engaged in protected activity (filing a charge of discrimination) and as a result suffered the adverse employment action of which he complains. If the evidence is uncontradicted, the plaintiff is entitled to summary judgment. If it is contradicted, the case must be tried unless the defendant presents unrebutted evidence that he would have taken the adverse employment action against the plaintiff even if he had had no retaliatory motive; in that event the defendant is entitled to summary judgment because he has shown that the plaintiff wasn't harmed by retaliation.
>
> ***
>
> The second route to summary judgment, the adaptation of *McDonnell Douglas* [*Corp. v. Green*, 411 U.S.

792 (1973)] to the retaliation context, requires the plaintiff to show that after filing the charge only he, and not any similarly situated employee who did not file a charge, was subjected to an adverse employment action even though he was performing his job in a satisfactory manner. If the defendant presents no evidence in response, the plaintiff is entitled to summary judgment. If the defendant presents unrebutted evidence of a noninvidious reason for the adverse action, he is entitled to summary judgment. Otherwise there must be a trial.

*Stone v. City of Indianapolis Pub. Util. Div.*, 281 F.3d 640, 644 (7th Cir. 2002).

Bernier says that he is proceeding only under the indirect method of proof, although in this case the choice makes no difference. Either way, he needed to show that he engaged in statutorily protected activity. Once again, his cryptic and anonymous instant message is not enough. In order to have engaged in statutorily protected expression, Bernier must genuinely have believed that he had been harassed and actually opposed the alleged sexual harassment by communicating his good faith belief to Morningstar. See *Fine*, 305 F.3d at 752 ("All that is required is that '[he] reasonably believed in good faith that the practice [he] opposed violated Title VII.'" (citation omitted)). This combination of subjective belief and objective *notification* means that "[a]n employee can honestly believe [he] is the object of discrimination, but if [he] never mentions it, a claim of retaliation is not implicated, for an employer cannot retaliate when it is unaware of any complaints." *Sitar v. Indiana Dept. of Transp.*, 344 F.3d 720, 727 (7th Cir. 2003). As a result, Bernier's failure to notify Morningstar of the alleged harassment dooms his retaliation claim as well.

Even if Bernier had established a *prima facie* case for retaliation, Morningstar has articulated two non-

invidious reasons for firing him—his improper use of the messaging system to send the anonymous instant message and his lie in the meeting when he was asked about the message. Bernier may be correct that any response he gave to the question that Fitzpatrick, Dorsey, and Kelly asked might have led to his firing, but we do not see how that fact could establish that Morningstar was engaged in impermissible discrimination. Morningstar had the right to question him about the message, and it had the right to terminate him for lying. "While Title VII protects victims of sexual harassment from being terminated in retaliation for reporting harassment, an employee's complaint of harassment does not immunize h[im] from being subsequently disciplined or terminated for workplace behavior." *Hall*, 276 F.3d at 359. As a result, his retaliation claim was also correctly dismissed.

*    *    *

The judgment of the district court is AFFIRMED.

A true Copy:

Teste:

_____

*Clerk of the United States Court of
Appeals for the Seventh Circuit*